IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

BETTY S. CLAY,

        Plaintiff,

        v.                       Civil Action No. 2:08-CV-25

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.    <u>Background</u>

        Plaintiff, Betty S. Clay, (Claimant), filed a Complaint on January 28, 2008 seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on April

25, 2008.[2]  Claimant filed her Motion for Summary Judgment on May 27, 2008.[3]  Commissioner

filed his Motion for Summary Judgment on June 16, 2008.[4]

B.    <u>The Pleadings</u>

        1.    <u>Plaintiff's Brief in Support of Motion for Summary Judgment</u>.

        2.    <u>Defendant's Brief in Support of Motion for Summary Judgment</u>.

---

[1] Docket No. 1.

[2] Docket No. 10.

[3] Docket No. 13.

[4] Docket No. 15.

C.    Recommendation

I recommend that:

1.    Claimant's Motion for Summary Judgment be **DENIED** because the ALJ
properly explained his reasons for failing to give controlling weight to claimant's treating
physicians and he properly determined claimant's RFC.

2.    Commissioner's Motion for Summary Judgment be **GRANTED** for the same
reasons set forth above.

## II.  Facts

A.    Procedural History

On January 26, 2005, claimant filed an application for Disability Insurance Benefits
("DIB") and SSI alleging the onset date of disability to be December 30, 2002 due to depression.
(Tr. 57-66, 74-75).  This application was denied initially on April 26, 2005 (Tr. 28-32), and upon
reconsideration on October 19, 2005.  (Tr. 34-36).  On November 22, 2005, claimant submitted a
request for a hearing before an ALJ.  (Tr. 37).  A hearing was held on December 18, 2006 at
which claimant and a vocational expert testified.  (Tr. 460-487).  The ALJ denied the claim by
written decision on February 27, 2007 finding that claimant was not disabled because she had no
medically determinable impairments which met or equaled a listing in Appendix 1, Subpart P,
Regulation No. 4 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and
416.926) and she could perform a range of light work.  (Tr. 13-24).  Claimant's Request for
Review was timely filed on March 26, 2007.  (Tr. 9).  On December 14, 2007, the Appeals
Council denied the request.  (Tr. 4-6).  Therefore, on December 14, 2007, the ALJ's decision
became the final decision of the Commissioner.  Having exhausted her administrative remedies,

claimant filed this action, which proceeded as set forth above.

B.     Personal History

Claimant was forty-three years old on the alleged onset date of December 30, 2002. Her date of birth is July 31, 1959 (Tr. 58). Claimant was therefore a "younger individual 18-44" within the meaning of the regulations prior to July 31, 2004. From that date, she has been a "younger individual 45-49" within the meaning of the regulations. 20 C.F.R. § 416.968. Claimant graduated from high school. (Tr. 79). Claimant has prior work experience as a recreational aide, performing clerical and secretarial duties, and as a receptionist. (Tr. 75, 84, 465-68).

C.     Medical History

The following medical history is relevant to the issues of whether the ALJ erred in failing to give appropriate weight to the treating physicians' opinions and whether he erred in determining claimant's RFC:

**Charles Bess, M.D., 7/11/98, (Tr. 127)**
Subjective: Patient has anxiety, insomnia and arthralgia's. Patient complains of sinus infection.

Physical Examination: This is a well developed, well nourished patient in no acute distress

**Potomac Highlands Guild, Clinical Evaluation, 1/29/99, 2/18/99, (Tr. 140)**
2/18/99
Presenting problem: Depression/anxiety, family conflict

Clinical Impression:
Level of consciousness - Alert
Appearance - Appropriately dressed
Speech - Pressured
Behavior - Nervous
Eye contact - Fair
Conduct - Cooperative
Psychomotor - Restless, agitation
Affect - Elevated, downcast

Mood - Depressed

Diagnostic Impression:
Axis I -        Depressive disorder NOS
Axis II -       No diagnosis
Axis III -      Applying for SSI due to work injury
Axis IV -       Psychosocial stressors: son's oppositional, husband's physical illness
Axis V -        Current GAF: 58

1/29/99
Chief Complaint - Depression
Occasional suicidal thoughts

Diagnostic Impression:
Axis I -        Dysthymic disorder
Axis II -       No diagnosis
Axis III -      Children, employment
Axis IV -       Psychosocial stressors: scoliosis, sinusitis
Axis V -        Current GAF: 60

**Potomac Valley Hospital, Radiology Report, 3/1/01, 8/27/01, (Tr. 169)**
Cervical Spine - Cervical spine series demonstrates the cervical spine from the base of occiput to T1. There is no acute fracture or dislocation.

Impression:
1. No fracture

Thoracic Spine - Frontal lateral view of the thoracic spine demonstrates a moderate scoliosis, convexed to the right involving the mid and lower thoracic spine as well as the upper lumbar spine.

Impression:
1. Scoliosis involving the thoracolumbar spine convexed to the right in the thoracic spine and convexed to the left in the lumbar spine.

Lumbosacral Spine - Lumbosacral spine series demonstrates a moderate scoliosis convexed to the left. There are no fractures.

Impression:
1. Moderate scoliosis convexed to the left in the lumbar region.

Portable Chest - Cardiac silhouette is within normal limits. Hilar and madiastinal structures and lung fields are unremarkable. Moderate scoliosis of the thoracic spine is seen. Bony thorax is unremarkable.

Impression:
1.  Unremarkable chest showing no evidence of acute parenchymal process.
2.  Moderate scoliosis of the thoracic spine.

**Western Maryland Health System, William A. May, M.D., 4/25/07, (Tr. 174)**
Chief Complaint - Back pain
Past Medical History - Chronic back problems
Diagnosis - Lumbar strain

**Sacred Heart Hospital, Mohammad Shafiei, M.D., 4/3/2000, (Tr. 177)**
Impression -    1.  The presence of moderate rotary scoliosis of the lumbar spine is noted.
                2.  No evidence of disk herniation or spinal stenosis is noted.


Assessment -    Lumbar radiculopathy

10/12/00
Subjective - continues to complain of recurrent headache.  Medications helping

**Potomac Valley Hospital Emergency Room, 6/03-2/05, (Tr. 187-250)**
Multiple visits to ER, primarily for cough and sinus problems.  On January 24, 2005, patient
reported back spasms and numbness.  She was prescribed a muscle relaxant and instructed to
apply heat, to rest, and to limit shoveling.

**Tracy Cosner-Shepherd, M.S., West Virginia DDS, 4/29/2005, (Tr. 273-78)**
Clinical Interview and Mental Status Examination:

General Observations
Psychomotor was within normal limits, as she did not have any notable difficulties ambulating
and did not require the use of an aid.  Movements were neither hyperactive nor retarded.

Chief Complaints
She is applying for disability because, "depression, asthma, migraines, and scoliosis."

Presenting Symptoms
The claimant stated, "I get frustrated easy...anger...forgetfulness...can't concentrate...mood
swings..."  She reports having difficulty sleeping and has frequent crying episodes.  She states
she has been depressed for about three years and has anxiety attacks.  She reports having energy
on some days.

Objective Findings
Depressive features and anxious features; memory impairment; impaired concentration; some
legal difficulties in the past; somewhat limited activities and social interations

Diagnoses

| | | |
|---|---|---|
| Axis I | 300.4 | Dysthymic disorder |
| | 300.0 | Anxiety disorder, NOS |
| Axis II | | Deferred |
| Axis III | | Scoliosis |
| | | Frequent headaches |
| | | Back pain |
| | | Asthma |
| | | Migraines (self-report) |

**Frank Roman, EdD, Mental RFC & Psychiatric Review Technique, 4/21/05, (Tr. 279-96)**

Mental RFC:

Understanding and Memory

Ability to understand and remember detailed instructions - Moderately limited

Sustained Concentration and Persistence

Ability to carry out detailed instructions - Moderately limited

Ability to maintain attention and concentration for extended periods - Moderately limited

Social Interaction

Ability to accept instructions and respond appropriately to criticism from supervisors - Moderately limited

Psychiatric Review Technique:

Categories upon which the medical disposition is based:

-12.04 Affective disorders

-12.06 Anxiety-related disorders

12.04 Affective Disorders:

-Depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking

12.06 Anxiety-Related Disorders:

Anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms, as evidenced by generalized persistent anxiety accompanied by motor tension and apprehensive expectation

Rating of Functional Limitations:

1. Restriction of activities of daily living - mild
2. Difficulties in maintaining social functioning - moderate
3. Difficulties in maintaining concentration, persistence, or pace - moderate
4. Episodes of decompensation - none

Axis I:         Dysthymic Disorder
             Anxiety Disorder

**Thomas Lauderman, D.O., Physical RFC, 4/25/05, (Tr. 297-304)**
Exertional limitations:
-Occasionally lift and/or carry 20 pounds

-Frequently lift and/or carry 10 pounds
-Stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday
-Sit (with normal breaks) for a total of about 6 hours in an 8-hour workday
-Push and/or pull unlimited

Postural limitations:
Occasionally climb, balance, stoop, kneel, crouch and crawl

No manipulative, visual or communicative limitations

Environmental Limitations:
Avoid concentrated exposure to extreme heat/cold and hazards (machinery, heights, etc.)

Symptoms:
Claimant indicates that she has severe back pain, migraines and asthma attacks.  She states sometimes she cannot do house chores due to back pain.  She did not allege any physical allegations on the 3368, however did allege them on her adult function report.  She is able to shop, take care of her personal needs, she can walk 3 blocks.  The scoliosis would cause back pain and asthma would cause sob at times.  The claimant also has mental impairments which restrict her ability to function at times.  Due to her physical complaints she appears partially credible.

**Saweikis Family Medicine, Anthony Saweikis, M.D., 7/01-9/05, (Tr. 305-87)**
9/20/2005:
C/O sinus flare-up.
Neuro: Cranial nerves II-XII grossly intact.  DTR's are 2+ and symmetric.  Strength is 5/5 in all muscle groups tested.  No focal deficits.

8/18/2005:
C/O coughing spells at times.
Neuro:  Cranial nerves II-XII grossly intact.  DTR's are 2+ and symmetric.  Strength is 5/5 in all muscle groups tested.  No focal deficits.

7/11/2005:
C/O asthma attacks and headaches.
Neuro:  Cranial nerves II-XII grossly intact.  DTR's are 2+ and symmetric.  Strength is 5/5 in all muscle groups tested.  No focal deficits.

6/22/2005:

C/O asthma flare-up. Claimant discussed disability.
Neuro: Cranial nerves II-XII grossly intact. DTR's are 2+ and symmetric. Strength is 5/5 in all muscle groups tested. No focal deficits.

4/26/2005
C/O hives
Neuro: Cranial nerves II-XII grossly intact. DTR's are 2+ and symmetric. Strength is 5/5 in all muscle groups tested. No focal deficits.

4/5/2005
C/O asthma flare-ups, coughing and wheezing.
Neuro: Cranial nerves II-XII grossly intact. DTR's are 2+ and symmetric. Strength is 5/5 in all muscle groups tested. No focal deficits.

3/17/2005
C/O cough, chest tightness and headache.
Neuro: Cranial nerves II-XII grossly intact. DTR's are 2+ and symmetric. Strength is 5/5 in all muscle groups tested. No focal deficits.

2/11/2005
C/O asthma, wheezing, coughing.
Neuro: Cranial nerves II-XII grossly intact. DTR's are 2+ and symmetric. Strength is 5/5 in all muscle groups tested. No focal deficits.

1/13/2005
C/O numbness in her right thigh.
Neuro: Cranial nerves II-XII grossly intact. DTR's are 2+ and symmetric. Strength is 5/5 in all muscle groups tested. No focal deficits.

12/3/2004
C/O cough, chest congestion and wheezing
Impression: Bronchitis

10/1/2004
C/O shortness of breath, headache, sinus pressure, right ear ache.
Impression: Sinusitis

9/9/2004
C/O facial and forehead injury, migraines, congestion, post-nasal drip and headache
Impression: Asthma, Migraines, anxiety, contusion-forehead

6/2/2004
Annual Physical
Chest pain and shortness of breath. C/O sinus migraines.

Impression: Asthma, sinus congestion,  Dysmenorrhea

5/3/2004
C/O sinus migraine
Impression: Migraine

3/17/2004
C/O sinus pain, pressure in face.  Chest is sore also.
Impression: URI

3/4/2004
C/O hives
Impression: Pruritis

3/3/2004
C/O possible yeast infection
Impression: Yeast vaginitis

2/9/2004
C/O menstrual cramps
Impression: Dysmenorrhea

12/8/2003
C/O cough, productice anxiety attacks, hyperventilitating, knot on right side of neck
Impression: Panic/anxiety, allergic ehinitis (sp?) and asthma

11/10/2003
C/O cough, sob, sore throat
Impression: asthmatic bronchitis

8/12/2003
Scoliosis, migraines, c/o sinus headaches
Impression: scoliosis, migraine

7/18/2003
C/O sinus congestion and coughing
Impression: sinusitis

6/11/2003
C/O cough, chills and fever
Impression: URI

4/16/2003
C/O being moody and agitated, dry mouth, stress

Impression: scoliosis and chronic lower back pain, migraines

2/12/2003
C/O nasal drainage
Impression: Allergic rhinitis

2/6/2003
C/O sore throat, cough, ear pain, headache, nasal drainage, sinus pain, achey, chills, fever
Impression: Sinusitis, migraines

**Suratkal Shenoy, M.D., 11/05-6/06 (Tr. 388-429, 432-33)**
6/19/2006 Medical Assessment of Physical Ability to do Work Related Activities
Lifting: Patient can lift and carry 5 pounds max.
Standing, sitting, walking and required rest: Patient can stay on her feet, stand and walk, sit, for no more than 1 hours at a time. Patient can alternate between sitting and standing without having to lie down for 1 hours. Patient needs less than 1 hour of bedrest during an 8 hour workday.
Hands, legs and feet: Patient can user her hands for simple grasping, but she cannot use her fingers for fine manipulation, she cannot push and pull arm controls and she cannot push and pull leg and foot controls.
Postural: The patient is never able to reach, squat, crawl, climb or reach.
Environmental: The patient's limitation against unprotected heights is severe. Her limitation against being around moving machinery is severe. Her limitation against exposure to marked changes in temperature and humidity is severe. Her limitation against driving automotive equipment is severe. Her limitation against exposure to dust and fumes is severe.
Pain: Dr. believes patient's complaints of pain and the pain is present even when not exceeding the activities described above. Dr. reports the degree of pain is debilitating and the objective evidence demonstrating the condition which gives rise to her degree of pain is breast cancer and chemotherapy.

1/25/2006
Preoperative Diagnosis: Lobular intraductal infiltrating carcinoma of the right breast on a biopsy specimen two weeks ago. Metastatic work-up is negative. Focal margins showing some malignancy.

Operation:
1.      Lumpectomy/quadrantectomy
2.      Axillary node dissection

1/19/2006 Radiology Report
Observation: CHEST, TWO VIEWS
Two views of the chest are submitted.
The heart size, mediastinum, and hila are unremarkable. The pulmonary vascular markings are within normal limits. There is no evidence of an acute parenchymal process involving either

lung.  Costrophrenic angles are sharp without evidence of pleural effusion.  The bony thorax appears unremarkable.

Impression:
1.  No acute parenchymal process.

1/18/2006 Radiology Report
Observation: WHOLE BODY BONE SCAN: 26.6 mCi Tc99m MDP
Total body bone scan examination was performed after intravenous injection of 26.6 miCi of Tc99m MDP.  It demonstrates a scoliosis of the thoracolumbar spine.  No distinct focal bony lesion is seen to suggest a fracture or metastatic lesion.

Impression:
1.  Degenerative scoliosis of the thoracolumbar spine without any scintigraphic evidence of metastases or fracture.

**Qamar Zaman, M.D., 3/06-7/06, (Tr. 430-31, 434-57)**
5/30/2006 Medical Assessment of Physical Ability to do Work Related Activities
Lifting: Patient can lift and carry 10 pounds max.
Standing, sitting, walking and required rest: Patient can stay on her feet, stand and walk, sit, for no more than 4 hours at a time.  Patient can alternate between sitting and standing without having to lie down for 3 hours.  Patient needs less than 1 hour of bedrest during an 8 hour workday.
Hands, legs and feet: Patient can user her hands for simple grasping, she can use her fingers for fine manipulation, she can push and pull arm controls and she can push and pull leg and foot controls.
Postural: The patient is never able to reach.
Environmental: The patient's limitation against unprotected heights is moderate.  Her limitation against exposure to dust and fumes is severe.
Pain: Dr. believes patient's complaints of pain and the pain is present even when not exceeding the activities described above.

7/20/2006
History: Patient is a 46-year-old African American female with history of TlcN0M0 infiltrating lobular carcinoma of the right breast who has completed her dose dense A/C and Taxane.  She returns for f/u.

She has generalized aches and pains.  She denies any nausea, vomiting, diarrhea, constipation.  She complains of pain in her right arm.  She denies any fever, night sweats.  No sores in the mouth.  No complaint of any urgency, frequency, dysuria, hematuria.

Physical Exam: Alert, oriented.
Neck - No cervical, supraclavicular, infraclavicular adenopathy.  No jugular venous distension.  No thyromegaly.

Chest - Lungs are clear.  No rales, rhonchi, wheezing.  Heart: S1 and S2.
Abdomen - Soft and flat, no tenderness

Impression:
1.  TlcN0M0 right breast CA
2.  Status post lumpectomy
3.  Status post dose dense A/C and taxane
4.  ER/PR positive

Plan of Action: Continue to see Dr. Saweikis and Dr. Shenoy regularly.  See Dr. Watkins to start
radiation therapy.

7/6/2006
History: Patient is a 46-year-old African American female with history of TlcN0M0 infiltrating
lobular carcinoma of the right breast who has completed her dose dense A/C.  Has been on
Taxol.  She had dental extraction in spite of being counseled against as she apparently was given
antibiotics.  She returns for last course of Taxol.

She has usual aches and pains.  Does have some tingling, numbness.  She denies any nausea,
vomiting, diarrhea, constipation.  She denies any dysuria, urgency.

Physical Exam: Alert, oriented, slightly anxious, not in apparent distress.
Neck - No cervical, supraclavicular, infraclavicular adenopathy.  No jugular venous distension.
No thyromegaly.
Chest - Heart: S1 and S2.
Abdomen - Soft and flat, no tenderness
Extremities - No ankle adema, tenderness or varicose veins.

Impression:
1.  CA right breast, TlcN0M0
2. Status post dose dense A/C

6/22/2006
History: Patient is a 46-year-old African American female with history of TlcN0M0 infiltrating
lobular carcinoma of the right breast who has completed her dose dense A/C.  She returns for her
next course of Taxol.

No nausea, vomiting, diarrhea, constipation.  Denies any headaches, dizziness, syncope.  Denies
any dysuria, urgency or frequency.

Physical Exam: Alert, oriented.
Neck - No cervical, supraclavicular, infraclavicular adenopathy.  No jugular venous distension.  .
Chest - Lungs are clear.  No rales, rhonchi, wheezing.  Heart: S1 and S2.
Abdomen - Soft and flat, no tenderness

Extremities - No ankle adema, tenderness or varicose veins.

Impression:
1.  Right breast CA, Tlc, N0, M0
2. Status post dose dense A/C
3.  S/P Taxotere, on Taxol now
4.  Bone pain from Neulasta

6/8/2006
History: Patient is a 46-year-old African American female with history of TlcN0M0 infiltrating lobular carcinoma of the right breast who has completed her dose dense A/C.  She received her first course of Taxotere which caused discoloration of the nails.  She returns for second course and is going to receive Taxol today.

She complained of generalized aching which has been chronically present.  She was on Soma in the past and has been on Soma.  She denies any nausea, vomiting, diarrhea, constipation.  She denies any headaches, dizziness, syncope.  No complaint of sores in the mouth.  She denies any new complaints.

Physical Exam: Alert, oriented, slightly anxious, not in apparent distress.
Neck - No cervical, supraclavicular, infraclavicular adenopathy.  No jugular venous distension.  No thyromegaly.
Chest - Heart: S1 and S2.
Abdomen - Soft and flat, no tenderness
Extremities - No ankle adema, tenderness or varicose veins.

Impression:
1.  Right breast CA, TlcN0M0
2. Status post dose dense A/C
3. For second course of Taxane
4.  Anemia of chemotherapy

5/30/2006
History: Patient is a 46-year-old African American lady with right breast CA, TlcN0M0, who has infiltrating lobular carcinoma.  She has completed her does of dense AC and just received the first course of Taxotere.  She returns for f/u.

She has been having cough which has been nagging.  She denies any fever or night sweats.  No sores in the mouth.  She denies any urgency, frequency, dysuria, hematuria.  No complaint of any nausea, vomiting, diarrhea, constipation.  She denies any headaches, dizziness.

Physical Exam: Alert, oriented, slightly anxious, not in apparent distress.
Neck - No cervical, supraclavicular, infraclavicular adenopathy.  No jugular venous distension.  No thyromegaly.

Chest - Heart: S1 and S2.
Abdomen - Soft and flat, no tenderness
Extremities - No ankle adema, tenderness or varicose veins.

Impression:
1. CA right breast, TlcN0M0
2. Status post dose dense A/C
3. Bone pain from Neulasta
4. Acute bronchitis
5. Anemia of chemotherapy and malignancy

5/16/2006
History: Patient is a 46-year-old African American lady with right breast CA, TlcN0M0, who has infiltrating lobular carcinoma. She has completed her does of dense AC and just received the first course of Taxotere. She returns for f/u.

She has been having cough which has been nagging. She denies any fever or night sweats. No sores in the mouth. She denies any urgency, frequency, dysuria, hematuria. No complaint of any nausea, vomiting, diarrhea, constipation. She denies any headaches, dizziness.

Physical Exam: Alert, oriented, slightly anxious, not in apparent distress.
Neck - No cervical, supraclavicular, infraclavicular adenopathy. No jugular venous distension. No thyromegaly.
Chest - Heart: S1 and S2.
Abdomen - Soft and flat, no tenderness
Extremities - No ankle adema, tenderness or varicose veins.

Impression:
1. CA right breast, TlcN0M0
2. Status post dose dense A/C
3. Bone pain from Neulasta
4. Acute bronchitis
5. Anemia of chemotherapy and malignancy

5/16/2006
History: Patient is a 46-year-old African American female with a history of TlcN0M0, who has infiltrating lobular carcinoma. She has completed her does of dense AC. She returns to start Taxane.

Denies any dysuria, urgency or frequency. No hematuria or flank pain. No nausea, vomiting, diarrhea. Denies any headaches, dizziness, syncope.

Physical Exam: Alert, oriented.
Neck - No cervical, supraclavicular, infraclavicular adenopathy. No jugular venous distension.

No thyromegaly.
Chest - Lungs are clear.  No rales, rhonchi, wheezing.  Heart: S1 and S2.
Abdomen - Soft and flat, no tenderness
Extremities - No ankle adema, tenderness or varicose veins.

Impression:
1. CA right breast, TlcN0M0
2. Status post dose dense A/C
3. For initiation of Taxotere
4. Bone pain from Neulasta
5. Anemia of chemotherapy and malignancy improved

## 4/18/2006
History: Patient is a 46-year-old African American female with a history of TlcN0M0, who has infiltrating lobular carcinoma of the right breast who returns for the 3rd course of A/C.  She has had problems with bone pains from Neulasta.  Recently, she has been having problems with sleeping.  She also noticed her palms are getting darker.

Denies any fever or night sweats.  No complaint of sores in mouth.  She gets dyspneic on exertion.  Denies any nausea, constipation, diarrhea but did have some vomiting.

Physical Exam: Alert, oriented.
Neck - No cervical, supraclavicular, infraclavicular adenopathy.  No jugular venous distension.  No thyromegaly.
Chest - Lungs are clear.  No rales, rhonchi, wheezing.  Heart: S1 and S2.
Abdomen - Soft and flat, no hepatosplenomegaly, no tenderness
Extremities - No ankle adema, tenderness or varicose veins.

Impression:
1. CA right breast, TlcN0M0
2. For 3rd course of dose dense A/C
3.  Bone pains from Neulasta

## 4/4/2006
History: Patient is a 46 year old African American female with history of T1N0M0 infiltrating lobular carcinoma of the right breast who returns for 2nd course of A/C.  She has diffuse bone pain from Neulasta, was not controlled with Tylenol and she is unable to take non-steroidal anti-inflammatory agents.  Hence she has been taking Percocet.  Lorcet did not help the pain.

She denies any sores in mouth.  She denies any nausea, vomiting.  Her weight is stable.  She denies any dysuria, urgency, frequency.  No complaint of cough, hemoptysis.

Physical Exam: Alert, oriented.
Neck - No cervical, supraclavicular, infraclavicular adenopathy.  No jugular venous distension.

No thyromegaly.
Chest - Lungs are clear.  No rales, rhonchi, wheezing.  Heart: S1 and S2.
Abdomen - Soft and flat, no hepatosplenomegaly.
Extremities - No ankle adema, tenderness or varicose veins.

Impression:
1.  CA breast, TlcN0M0, infiltrating lobular carcinoma of the right breast, moderately differentiated
2.  S/P A/C x1
3.  Bone pain from Neulasta

3/28/2006
History: Patient is a 46 year old African American female with history of T1N0M0 infiltrating lobular carcinoma who returns for f/u after first course of A/C.

She is complaining of soreness in the mouth.  She has burning in the mouth.  She denies any urgency, frequency, dysuria, hematuria

Physical Exam: Alert, oriented.
Neck - No cervical, supraclavicular, infraclavicular adenopathy.  No jugular venous distension.  No thyromegaly.
Chest - Lungs are clear.  No rales, rhonchi, wheezing.  Heart: S1 and S2.
Abdomen - Soft and flat, no hepatosplenomegaly.
Extremities - No ankle adema, tenderness or varicose veins.

Impression:
1.  CA breast, TlcN0M0
2.  On A/C
3.  Oral candida
4.  Hyperkalemia

3/21/2006
History: Patient is a 46 year old African American female with history of T1N0M0 infiltrating lobular carcinoma who returns for f/u after first course of A/C.

Denies any fever or night sweats but did have significant nausea.  She also has hot flashes and mild aches.  She did receive IV iron.  No complaint of sores in the mouth.  Denies any tingling or numbness in the fingers or toes.  She gets tired easily.

Physical Exam: Alert, oriented.
Neck - No cervical, supraclavicular, infraclavicular adenopathy.  No jugular venous distension.  No tenderness.
Chest - Lungs are clear.  No rales, rhonchi, wheezing.  Heart: S1 and S2.
Abdomen - Soft and flat, no tenderness.

Extremities - No ankle adema, tenderness or varicose veins.

Impression:
1. CA breast, TlcN0M0
2. S/P IV iron
3. Delayed nausea, vomiting

3/13/2006

History: Patient is a 46 year old African American female who palpated a lump in the tail of the right breast. She underwent mammography at Potomac Valley Hospital which showed no mass in the right breast. Several small cysts measuring less than 5 mm were seen in the right breast. Left breast showed a cluster of amorphous calcifications in the superior lateral quadrant and a biopsy was recommended. The patient had a stereotactic biopsy of the left breast done at ADR. Calcifications were not visible on digital mammography. Biopsy was canceled. A follow-up of left breast was scheduled for March 6. The patient was noted to have a mass in the right breast. Biopsy revealed infiltrating lobular carcinoma with a minor infiltrating ductal component. Focal carcinoma in situ was noted. Tumor was noted to extend to the inked resection margin. Tumor size was 1.9cm. Nottingham score 7 of 9, moderately differentiated. Her -2 is negative. ER/PR are positive. The patient underwent conservative lumpectomy and lymph node dissection. Seven lymph nodes were negative for metastatic disease. The patient was seen by Dr. Ahmad and is here for initiation of chemotherapy. She also has seen Dr. Watkins.

She denies any fever or night sweats. No sores in the mouth. She denies any unexplained weight loss. She denies any headaches, dizziness.

Past Medical History:
1. D&D in the past for benign disease
2. Biopsy of the right breast in 1988
3. Menorrhagia
4. H/O anemia

Physical Exam: Alert, oriented, not in apparent distress, slightly anxious
Neck - No cervical, supraclavicular, infraclavicular adenopathy. No jugular venous distension. No thyromegaly.
Chest - Lungs are clear. No rales, rhonchi, wheezing. Heart: S1 and S2.
Abdomen - Soft and flat, no hepatosplenomegaly.
Extremities - No ankle adema, tenderness or varicose veins.

Impression:
1. CA breast, TlcN0M0
2. ER/PR positive
3. Her-2 negative
4. Iron deficiency anemia
5. Menorrhagia

6. H/O D&C

**Scott Watkins, M.D., 2/2006-8/06 (Tr. 434-35, 458-59)**
8/7/2006 Simulation/Treatment Planning Note
Diagnosis: T1CN0M0 infiltrating lobular carcinoma of the right breast, ER/PR positive, HER-2 Neu negative.

Treatment History: Patient has completed her chemotherapy. The last dose was delivered in early July. She completed dose dense AC and Taxol.

Interval History: Patient returns for her first follow up visit after chemotherapy. She states that she is feeling relatively well. Here energy has improved but is not yet baseline. She has no significant peripheral neuropathy although she does complain of significant pain in the upper right extremity. She has no lymphedema but does have significantly decreased mobility.

Patient denies other symptoms of shortness of breath, cough, hemoptysis, change in appetite, weight loss or bone pain.

D.    Testimonial Evidence

Testimony was taken at a hearing held on December 18, 2006. The following portions of the testimony are relevant to the disposition of the case:

Q       Okay. Now, what physical problems do you have today?

A       I have physical problem with sitting for a certain period of time because of my back pain.

ALJ           And how long would that be before you have to - - you feel you have to get up or change position or move around or whatever?

CLMT        About every 15 minutes.

ALJ           15 minutes. Okay.

BY ATTORNEY:

Q       What other problems do you have?

A       I have problems concentrating on my tasks because of my medication that I take.

18

Q        Okay.

A        Typing because of my tendonitis in my wrist. I'm unable to type anymore.

Q        Okay.

A        And file.

Q        Do you have difficulty with lifting or bending or things of that sort?

A        Yes, I do.

Q        Does that relate to your back?

A        Yes. And my arm.

Q        Okay. At the present time are you under a doctor's case?

A        Yes, I am.

Q        Who is your primary doctor?

A        Dr. Saweikis.

                              *              *              *

Q        Is he your primary care provider?

A        Yes.

Q        Have you also seen other doctors in the past five or 10 years?

A        Yes. My cancer doctor.

Q        Okay. Do you have a history of cancer?

A        Yes.

Q        What type of cancer did you have?

A        I had breast cancer.

Q        Was that surgically treated?

A        Surgically treated, yes.  Did chemo for four months.  Six months of radiation.

ALJ            Yes, I have read the file, ma'am.   There seems to have been no recurrence of that at this point.  Is that correct?

CLMT        Yes.

ALJ            Okay.

BY ATTORNEY:

Q        Do you remain under any type of follow up care for your cancer?

A        Yes.

Q        What is that?

A        Daily mammograms.  And I'm scheduled for a mammogram of the 20th of this month.

Q        Do you take medication?

A        I take medication.  I take Tomoxapin [phonetic].  I have to take that for five years.

Q        Okay.  And are you still within that five-year period?

A        Yes.

Q        Okay.  Do you have asthma?

A        I have asthma.

Q        What problems does that cause you if any on a day to day basis?

A        Problems breathing.  Walking.  Limit my mobility to walk places.

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q        Do you use inhalers?

A        I use a nebulizer.

Q        Nebulizer.

A        Nebulizer, yes.

Q        Okay.

A        And - -

Q        How often do you use it?

A        Twice a week.

Q        And how long does it take each time that you do that?

A        20 minutes.

ALJ    Okay.

BY ATTORNEY:

Q        Okay.  Do you suffer from migraine headaches?

A        Yes.

Q        And tell us about that.  What - -

A        I - -

Q        - - do you experience upon the onset of a migraine?

A        Real bad headaches.  Blinding headaches.  Requires me to lay down for a period
of time.

Q        And you mentioned before in talking about the work that you have done that you
have back pain.

A        Yes.

Q        Have you had a back injury or is this something that has developed over time?

A        A back injury.

Q       When did you have a back injury?

A       '79.  1979.

Q       Okay.

A       I fell down some steps.

Q       And do you maintain that you still have residual problems from that injury?

A       Yes.

Q       Do they affect your range of motion?

A       Yes.

Q       And do they cause you periodic incidence of pain?

A       Yes.

Q       Have you been diagnosed with depression?

A       Yes, sir.  Yes.

                        *               *               *


BY ATTORNEY:

Q       Do you notice, Betty, since being diagnosed with depression if you have any

difficulty performing your daily activities?

A       Yes.

Q       How so?

A       I don't like being around people.  I don't like going out anymore, so - -

Q       Are you able to care for yourself and attend to the household chores at home?

A       Sometimes.

Q        Do you have anyone help you with that?

A        Yes.

Q        Who?

A        My husband.

Q        Who is here with you today?

A        Um-hum.

Q        Do you have difficulty functioning in a social setting - -

A        Yes.

Q        - - at this time?  Do you have any particular difficulty concentrating?

A        Yes.

Q        Or attending a certain task?

A        Yes.  I have lack of concentration.

                                *              *              *

Q        Okay.  Earlier you talked about difficulty concentrating.  Do the medications have

any particular side effects have you noticed?

A        Yes.  The Furorcet, the Soma and the Percocet.

Q        What do - - what is - - what are the side effects of those medications?

A        Drowsiness, dizziness.

Q        Do they cause - -

A        Cause - -

Q        - - difficulty - -

A        - - difficulty - -

Q         - - in concentrating?

A         - - in concentrating.  Yes.

                    *                    *                    *

ALJ            All right.  Go ahead, please.

ATTY           To conclude, Betty, you have prior experience in the clerical field and as
what's been referred to as recreational aid.  Given what you've testified about here today do you
have reason to think that you would be able to go back to either of those types of employment?

CLMT           No, sir.

ATTY           Okay.  Can you tell Judge Alexander why in your experience doing those
jobs you don't believe that you could do those at this time?

CLMT           Because of the back pain.  Requires sitting and standing at certain times.
Typing, talking on the phone.  Lack of communication.  I'm not able to do that anymore.

ALJ            What if you had a job where you could sit and stand as you choose and
didn't have to do any typing?

CLMT           I'd still be on medication.  Unable to perform as needed.

ALJ            Okay.

ATTY           Do you feel you would have a problem interacting with the public - -

CLMT           Yes.

ATTY           - - at this time?

CLMT           Yes.

ATTY           And you f eel you would have difficulty concentrating on performing that
type of work?

CLMT            Yes.

*               *               *

A       I review a file and it indicated that you worked as a recreational leader from 1989 to 1995.  Your testimony today was that you did that for approximately seven years.  And when I reviewed a file it - - I'm trying to determine if - - what was your main activity in the job.  Whether you primarily did all the typing and the office work and then on occasion or even rarely had to watch the kids.  I think that's how you wrote it up that you would have to watch the kids I think once a week or something or like on Saturdays I think it said or - -

CLMT            No.  During the week.  Monday through Friday.

VE              Okay.

CLMT            Whenever there was no school.

VE              Okay.  So, what did you do the most?  When you watched the kids did you do that - - did you pretty much just have to observe them and not have to pick them up or - -

CLMT            Yes.

VE              - - anything?

CLMT            Observe them.

VE              Did you - - what did you do most, watch the kids or did you do the clerical work?  What was - -

CLMT            Clerical.

VE              So, you primarily did the clerical work and then kind of supplemented - - helped someone else out to watch the kids or something or - -

CLMT            Yes.

A       Sedentary and semiskilled.

Q       Same.  Right.  Then let me ask you to assume a hypothetical individual of the claimant's age, educational background and work history who would be able to perform a range of light work.  Would require a sit/stand option.  Could perform postural movements occasionally but could not climb ladders, ropes or scaffolds.  Should not be exposed to temperature extremes.  Should work in a low stress environment with no production line type of pace or individual decision making responsibilities.  Would be limited to unskilled work involving only routine and repetitive instructions and tasks.  Should have no interaction with the general public and only occasional interaction with others.  And I would - - well, let's - - I would add to that that fine manipulation should be limited to an occasional basis, i.e. one third of the day.  Would there be any work in the regional or national economy that such a person could perform?  This person, excuse me, doctor, should not be exposed to environmental pollutants as well.

A       Yes, Your Honor.  And I'll define the local economy as the Hagerstown metropolitan statistical area combined with 10 percent of all jobs existing in the states of Pennsylvania and West Virginia.  There would be the work of an office helper.  In the local economy there are 892 jobs.  In the national economy 162,282 jobs.  There would be the work of a mail clerk.  That would be working in private industry as opposed to working for the postal service.  There are 625 jobs in the local economy.  82,490 in the national economy.  There would be the work of a sewing machine operator.  In the local economy there are 597 jobs.  In the national economy 118,906 jobs.

*          *          *

Q          Okay.  And as I understand your opinion you conclude I believe that my client falls into given her status a clerk/typist or a receptionist category, which is a sedentary category?

A          Yes.

Q          And in the event that her physician - - treating physician or physicians would place her in a less than sedentary capacity due to the effects of medication and persistent pain would the effectively rule her out of those positions?

A          Yes.

Q          And to be clear and with regard to your opinion you gave a few examples in the what you define as the local economy of jobs that you believe would be suitable for my client including office helper, mail clerk, sewing machine operator and I believe there was one more, which I missed.

A          No.  Those three.

Q          That was it?

A          Those three.

Q          Okay.  Would those positions be adversely affected or would the claimant's ability to maintain those positions be adversely affected by persistent need to be off work?  Persistent or regular absences from work.

A          Yes.


ATTY          Would her ability to hold down those jobs also be adversely affected if her ability to concentrate and complete a task from start to finish were also impaired?

ALJ            Impaired to what extent?

ATTY         Impaired to the - -

ALJ            How many percent of the day let's say?

ATTY         Sure.  Is that a fair way to describe that - -

ALJ            That's the best way.

VE             Yes.  I would appreciate if you could quantify the - -

BY ATTORNEY:

Q      If - -

A      - - absences for a period of time and also being off task for a period - -

Q      Let's say - -

A      - - of time.

Q      - - with regard to absences if she were required to be off work for example, three or four days a month.  Would that adversely affect her ability to hold down that work?

A      I believe that would preclude employment.

Q      And that would include those positions, which you talked about, the office helper, mail clerk and sewing machine operator?

A      Yes.

Q      If she has a lapse in concentration hypothetically during the performance of either of these jobs 10 percent of the time during the day realizing it may be task specific, would that affect her employability in those positions as well?

A      Well, actually, my studies would suggest that if an individual were off task more than 10 percent of a workday or work period that generally is not sufficient for maintaining

employment, so that 10 percent is kind of like I always testify being the threshold of being off task.

\* \* \*

E.      Lifestyle Evidence

The following evidence concerning claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how claimant's alleged impairments affect her daily life:

• Claimant takes her medicine, watches tv, plays music and cleans house. (Tr. 91)

• Claimant has no problems with personal care. (Tr. 92)

• Claimant cleans the bathroom and shops for food and clothing. (Tr. 93-94)

• Claimant can pay bills, but doesn't use a checkbook or money orders. (Tr. 94)

• Claimant does laundry twice per week. (Tr. 109, 277)

• Claimant is able to send her 16 year old off to school. (Tr. 277)

• Claimant takes walks at least twice per month. (Tr. 277)

• Claimant attends church weekly. (Tr. 277)

• Claimant cooks twice per week. (Tr. 277)

• Claimant is able to take care of herself and attend to household chores. (Tr. 474)

• Claimant does not drive because she is scared of getting in an accident. (Tr. 475)

### III.  The Motions for Summary Judgment

A.      Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, claimant alleges that the ALJ erred by failing to give controlling weight to the opinions

of claimant's treating physicians, Dr. Shenoy and Dr. Zaman. Claimant also alleges that the ALJ failed to properly determine the claimant's residual functional capacity ("RFC").

Commissioner maintains that substantial evidence supports the ALJ's decision and that the ALJ properly gave little weight to the treating physicians' medical opinions. Commissioner further contends that the ALJ properly supported the RFC assessment for a range of light work.

B.    The Standards.

1.    Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review. Only a final determination of the Commissioner may receive judicial review. See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.    Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it

prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4.      <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423C; <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.      <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  <u>Gordon v. Schweiker</u>, 725 F.2d 231,

235-36 (4th Cir. 1984).

8. <u>Social Security - Substantial Evidence - Defined</u>. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9. <u>Social Security - Sequential Analysis</u>. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether Claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the Claimant can perform her past work; and 5) whether the Claimant is capable of performing any work in the national economy. Once Claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the Claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the Claimant can perform some other job. <u>Rhoderick v. Heckler</u>, 737 F.2d 714-15 (7th Cir. 1984).

10. <u>Social Security - Substantial Evidence - Listed Impairment</u>. In order for the reviewing court to determine if the Secretary based the agency's decision on substantial evidence, the decision must include the reasons for the determination that the impairment does not meet or equal a listed impairment. <u>Cook</u>, 783 F.2d at 1168. The ALJ must identify the standard to be applied. <u>Id.</u> At 1173. The ALJ should compare each of the listed criteria to the evidence of Claimant's symptoms and explore all relevant facts. <u>Id</u>

11. <u>Social Security - Listing</u>. The ALJ must fully analyze whether a Claimant's

impairment meets or equals a "Listing" where there is factual support that a listing could be met. Cook , 783 F.2d at 1168. Cook "does not establish an inflexible rule requiring an exhaustive point-by-point discussion in all cases." Russell v. Chater, No. 94-2371 (4th Cir. July 7, 1995) (unpublished).[5] In determining disability, the ALJ is required to determine whether Claimant's condition is medically equal in severity to a listing. 20 C.F.R. §§ 404.1529(d)(3), 416.929(d)(3). The ALJ is required to explain his findings at each step of the evaluation process so that the reviewing court can make determinations on whether his decision is supported by substantial evidence. Gordon, 725 F.2d 231. See also Myers v. Califano, 611 F.2d 980, 983 (4th Cir. 1980).

12. Social Security - Treating Physician - Definition. A "treating source" is defined as a claimant's own "physician, psychologist, or other acceptable medical source" who provides a patient with medical treatment or evaluation and has an ongoing treatment relationship with the patient. 20 C.F.R. 404.1502. When the medical evidence establishes that the patient sees the physician with a frequency consistent with accepted medical practices for the type of treatment required, an ongoing treatment relationship is deemed to exist. See id. The term "other acceptable medical source" is defined as a licensed physician, a licensed osteopath, a licensed or certified psychologist , a licensed optometrist, and "persons authorized to send us a copy of summary of the medical records of a hospital, clinic, sanatorium, medical institution, or health care facility." 20 C.F.R. § 404.1513.

13. Social Security - Treating Physician - Opinion that Claimant is Disabled. An opinion that a claimant is disabled is not a medical opinion within the definition of 20 C.F.R. §§ 404.1527, 416.927. A statement by a medical source that Claimant is disabled or unable to work

---

[5] See FN 7.

does not mean that the Commissioner will determine that Claimant is disabled.  20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).  The Commissioner is responsible for making the determination whether a claimant meets the statutory definition of disability.  Id.  No special significance will be given to the source of an opinion on issues reserved to the Commissioner.  20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3).

14.     Social Security - Treating Physician - Not Entitled to Controlling Weight.  When not entitled to controlling weight, the medical opinion of a treating physician is still entitled to deference and must be weighed according to the following five factors: 1) length of the treatment relationship and frequency of examinations, 2) nature and extent of the treatment relationship, 3) supportability, 4) consistency, and 5) specialization.  20 C.F.R. §§ 404.1527(d), 416927(d).  When benefits are denied, the ALJ must give good reasons in the notice of decision for the weight given to a treating source's medical opinion(s).  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

15.     Social Security - Treating Physician - Controlling Weight - The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record.  20 C.F.R. § 416.927(d)(2).  See also  Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984); Heckler v. Campbell, 461 U.S. 458, 461 (1983); Throckmorton v.  U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir.  1990).

16.  Social Security - Treating Physician - No Controlling Weight - When an ALJ does not give a treating source opinion controlling weight and determines that the Claimant is not disabled, the determination or decision, "must contain specific reasons for the weight given to

the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p.

17.     Social Security - Claimant's Credibility.  "Because he had the opportunity to observe the demeanor and to determine the credibility of the Claimant, the ALJ's observations concerning these questions are to be given great weight."  Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976).  "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference.  See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997).  We will reverse an ALJ's credibility determination only if the Claimant can show it was 'patently wrong'"  Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990).

18.     Social Security - Residual Functional Capacity.  A Residual Functional Capacity is what Claimant can still do despite her limitations.  20 C.F.R. §§ 404.1545, 416.945.  Residual Functional Capacity is an assessment based upon all of the relevant evidence.  Id.  It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition.  Id.  Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used.  Id.  These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities.  Id.  This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a

Clamant may be able to do despite their impairments.  Id.

C.      Discussion

      1.      Whether the ALJ Erred by Failing to Give the Treating Physicians' Medical
            Opinions Controlling Weight

Claimant asserts that the ALJ erred by failing to give controlling weight to the medical

testimony of claimant's treating physicians, Dr. Shenoy and Dr. Zaman, and for failing to

recontact them for clarification.  The Commissioner counters that the ALJ properly evaluated the

medical opinions of record and properly declined to give claimant's treating physicians' opinions

controlling weight.

    All medical opinions are to be considered in determining the disability status of a

claimant.  20 C.F.R. §§ 404.1527(b), 416.927(b).  Nonetheless, opinions on ultimate issues, such

as RFC and disability status under the regulations, are reserved exclusively to the ALJ. 20 C.F.R.

§§ 404.1527(e)(1)-(3), 416.927(e)(1).  Statements by medical sources to the effect that a

claimant is "disabled" are not dispositive, but an ALJ must consider all medical findings and

evidence that support such statements.  Id.  The opinion of claimant's treating physician is

entitled to great weight and may only be disregarded if there is persuasive contradictory

evidence.  Evans, 734 F.2d at 1015.  Controlling weight may be given only in appropriate

circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an

individual's impairment(s), from treating sources, when the opinion is 1) well-supported by

medically acceptable clinical and laboratory diagnostic techniques, and 2) not inconsistent with

other substantial evidence in the case record.  20 C.F.R. §416.927(d)(2). See Craig, 76 F.3d at

590 (holding that a treating physician's medical opinion must be given controlling weight only

when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques

and is not inconsistent with the other substantial evidence" in the record). While the credibility of the opinions of the treating physician is entitled to great weight, it may be disregarded if there is persuasive contradictory evidence. Evans, 734 F.2d at 1015. To decide whether the impairment is adequately supported by medical evidence, the Social Security Act requires that impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Heckler v. Campbell, 461 U.S. at 461; 20 C.F.R. §§ 404.1508; Throckmorton, 932 F.2d at 297 n.1. Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist. 20 C.F.R. § 404.1527 (2005). Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). However, "Although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." Id. (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).

"If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." Social Security Ruling (SSR) 96-5p at *3. The ALJ undertook such an analysis here. It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. Hays, 907 F.2d. at 1456. The scope of

review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner.  Id.  The Court's review reveals that the ALJ reasonably resolved all such conflicts and that the record more than adequately bears out his conclusions.

Claimant cites § 404.1527(d)(2), as well as Mastro for the proposition that the ALJ should have accorded controlling weight to the treating physicians' opinions.  The Court agrees that Mastro is controlling.  However, it is unsupportive of claimant's argument.  Mastro supports Commissioner's contention that the opinions of Dr. Shenoy and Dr. Zaman were inconsistent with the objective medical evidence and claimant's self-reported daily activities, and therefore, the ALJ was not required to give controlling weight to their opinions.  As for claimant's contention that the treating physicians' opinions should have been weighed according to the factors stated in 20 C.F.R. § 404.1527(d), the ALJ did discuss some of the relevant factors in narrative form.  And while the ALJ did not explicitly and specifically reference every factor enumerated in § 404.1527(d)(2) with reference to Drs. Shenoy's and Zaman's opinions, he summarized almost the entire medical record before him.  (Tr. 19-22).  The ALJ then properly determined that the opinions of Dr. Shenoy and Dr. Zaman were not entitled to great weight. (Tr. 22).

The following summary of the ALJ's decision refutes the conclusions of the treating physicians, Dr. Shenoy and Zaman.  The claimant has exaggerated her symptoms and limitations.  In particular, her self-reported severe debilitating back pain is not supported by the objective evidence of her daily activities.  At one time, claimant reported being unable to walk more than one and one-half blocks without stopping to rest, yet she told Ms. Shepherd that she

walked for exercise and, in fact, walked over one mile from her home to the evaluation. She reported daily migraines to Dr. Saweikis, but told Dr. Watkins that her migraines were intermittent, estimating them to occur every three months. Claimant has reported numerous depressive symptoms, but she never sought any psychiatric or psychological treatment. Claimant testified that excessive drowsiness is another reason she is unable to work. However, there are no complaints to any of her treating physicians citing excessive drowsiness. (See Tr. 22).

With respect to Dr. Zaman, the ALJ noted that Dr. Zaman completed an assessment of claimant's ability to perform work-related activities in May, 2006. Dr. Zaman felt that the claimant would be able to lift no more than 10 pounds; unable to stand and walk in combination continuously for more than four hours; unable to sit more than four hours continuously; and would be unable to reach, even on an occasional basis. (Tr. 19). The ALJ next considered Dr. Shenoy's June, 2006 assessment of claimant's functioning. Dr. Shenoy opined that the claimant would be unable to lift and carry more than five pounds; the claimant would not have the capacity to stand, walk and sit in combination even one hour in an eight hour work day; the claimant would never be able to bend, squat, crawl, climb or reach in an eight hour workday. The ALJ further noted that Dr. Shenoy reported the claimant had severe limitations in all environmental categories listed. Dr. Shenoy felt that claimant's abilities would be even further reduced in all categories while receiving chemotherapy due to her debilitating pain. (Tr. 19). The Undersigned notes the extreme nature of Dr. Shenoy's assessment as compared to Dr. Zaman's, which occurred only one month before.

Additionally, the ALJ noted that he could not give Dr. Shenoy's and Dr. Zaman's

opinions significant weight in the decision because they were inconsistent with other substantial evidence in the case record. Specifically, Dr. Shenoy's opinion was contrary to the opinions of Drs. Watkins, Saweikis and the state agency physicians. It was also inconsistent with the reports of the claimant and her activities of daily living. (Tr. 22). In his decision, the ALJ noted that "the claimant reported doing laundry twice weekly." (Tr. 22). He used this evidence to support his conclusion that claimant could lift more than five pounds on a regular, continuing basis, which was directly contrary to Dr. Shenoy's opinion that the claimant would be unable to lift and carry five pounds. The Court agrees with claimant that this particular finding by the ALJ amounts to conjecture as there is no evidence to support his conclusion that the claimant is regularly lifting more than five pounds simply because she washes clothes twice a week. However, the ALJ cited claimant's ability to do laundry only as one example to contradict the opinions of Drs. Zaman and Shenoy. The ALJ stated multiple times that the treating physicians' opinions were contrary to the medical evidence as well as claimant's own reports and her activities of daily living. In his decision, he stated that the "medical evidence of record and [claimant's] activities [were] not consistent with Dr. Shenoy's and Dr. Zaman's severe limitations." (Tr. 19). Specifically, he stated that these opinions were contradicted by "the opinions of Drs. Watkins, Saweikis and the state agency physicians, as well as the reports of [claimant] and her activities of daily living." (Tr. 22). In their assessments, Dr. Shenoy and Dr. Zaman both reported claimant can "never" reach. (Tr. 432-35). However, along with doing the laundry, claimant reported that she went shopping for groceries and cleaned the bathroom, scouring the fixtures and the tub. The Undersigned agrees with the ALJ's finding that these activities require extensive reaching and therefore are directly contrary to the assessments of the

treating physicians.

Therefore, because Dr. Zaman's and Dr. Shenoy's opinions are inconsistent with other substantial evidence in the record, and because the ALJ gave reasons why they were entitled to little weight, the ALJ did not err when he did not give controlling weight to them.

Claimant further contends that the ALJ failed to recontact her treating physicians. The Commissioner counters that the ALJ properly evaluated Dr. Zaman's and Dr. Shenoy's opinions and, therefore, was not required to recontact them.

20 C.F.R. § 404.1512(e) provides in pertinent part:

> (e) Recontacting medical sources. When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we need additional information to reach a determination or a decision. To obtain the information, we will take the following actions.
> (1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques....

SSR 96-5p provides in relevant part:

> Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion.

Claimant alleges that the ALJ "should have contacted the treating physician[s]" because "the doctor's records were internally inconsistent." (Pl.'s Br. at 9). As a result, Claimant alleges that the ALJ was obligated to recontact Drs. Zaman and Shenoy to seek clarification. Id. However, the regulations only require the Commissioner to recontact a treating physician when

"the evidence we receive from your treating physician...is inadequate for us to determine whether you are disabled." 20 C.F.R. § 404.1512(e). In the present case, claimant submitted evidence from multiple treating and examining physicians. Contrary to claimant's argument, the ALJ found Dr. Zaman's and Dr. Shenoy's assessments inconsistent with the other evidence of record, and not "inadequate." 20 C.F.R. § 404.1512(e). See <u>Knight v. Chater</u>, 55 F.3d 309, 314 (7th Cir. 1995) (an ALJ may reject the opinion of the treating physician when it is internally inconsistent). Moreover, the extensive medical records in this case clearly provide an adequate basis for the Commissioner's determination that claimant is not disabled. Therefore, because the ALJ had sufficient evidence to make a disability determination, he was not required to recontact Dr. Zaman or Dr. Shenoy.

Accordingly, the ALJ properly evaluated the medical opinion evidence of Dr. Shenoy and Dr. Zaman.

2.    <u>Whether the ALJ Erred by Failing to Properly Determine Claimant's RFC</u>

Claimant asserts that the ALJ erred in determining claimant's RFC. She claims that the RFC is not based on substantial evidence of the record and that the ALJ failed to discuss what doctor opinions were the basis for his RFC finding. Commissioner counters that the ALJ had sufficient evidence to properly determine Claimant's RFC.

A Residual Functional Capacity is what a claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. <u>Id.</u> It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of claimant's medical condition. <u>Id.</u> Observations by treating physicians, psychologists, family, neighbors, friends, or

other persons, of claimant's limitations may be used.  Id.  These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a claimant from performing particular work activities.  Id.

A claimant's RFC is also based, in part, on the claimant's credibility.  Here, the ALJ properly found claimant not entirely credible.  Also, the ALJ properly assessed all of the medical records.  Accordingly, the ALJ determined that claimant retains the RFC "to perform a range of light work; with an option to sit or stand; performing all posturals occasionally, except no climbing of ladders, ropes or scaffolds; no exposure to temperature extremes; no production line type of pace or independent decision making responsibilities; is limited to unskilled work involving only routine and repetitive tasks; no exposure to environmental pollutants; no work with the general public; only occasional contact with coworkers and supervisors; and performing fine manipulation up to one-third of an eight-hour workday."  (Tr. 20-21).

Claimant continues to rely on the opinions of Drs. Shenoy and Zaman to support her contention that she is unable to perform sedentary work in the national economy.  She also argues that the ALJ failed to indicate what medical evidence he relied upon to support his RFC finding.  This argument is clearly without merit, however, because the ALJ identified the treatment notes of Drs. Watkins and Saweikis as well as the state agency physicians to support his RFC assessment.  (Tr. 22).  The ALJ was required to formulate the RFC assessment based on all of the evidence in the record, and he did that here.  Therefore, the ALJ properly determined claimant's RFC.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.    Claimant's Motion for Summary Judgment be **DENIED** because the ALJ properly explained his reasons for failing to give controlling weight to claimant's treating physicians and he properly determined claimant's RFC.

2.    Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: October 24, 2008

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE